IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CURTIS LAWRENCE, et. al.                    *
                                            *
              Plaintiff,                     *
                                            *
       vs.                                   *          Civil Action No.  ADC-22-00651
                                            *
DAP PRODUCTS, INC.,                         *
                                            *
              Defendant.                     *
                                            *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendant, DAP Products, Inc. ("Defendant" or "DAP"), moves this Court for summary judgment (the "Motion") (ECF No. 59) on Plaintiff Skyward Transportation LLC's ("Plaintiff" or "Skyward") Complaint. ECF No. 1. After considering the Motion and responses thereto (ECF Nos. 64, 65), the Court finds that no hearing is necessary. Loc.R. 105.6 (D.Md. 2023). In addition, having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds that there are no genuine issues of material fact as to any of the claims asserted. Accordingly, the Court will GRANT DAP's Motion for Summary Judgment.[1]

---

[1] On March 17, 2022, this case was assigned to United States Magistrate Judge A. David Copperthite for all proceedings in accordance with Standing Order 2019-07. ECF No. 4. All parties voluntarily consented in accordance with 28 U.S.C. § 636(c). ECF No. 23.

## Factual and Procedural Background

Skyward is a trucking company solely owned by Curtis Lawrence ("Mr. Lawrence"), who is a Black man[2]. ECF Nos. 1, 59, 64. DAP is a manufacturing company that produces and sells caulks, sealants, construction adhesives, insulating foams, spackling, and other "patch and repair" products. ECF No. 59-2. DAP is based in Baltimore, Maryland, but maintains a manufacturing facility (the "Plant") and a distribution center (the "Distribution Center") in Garland, Texas. *Id.* The Distribution Center is located approximately two miles away from the Plant, and thus DAP contracts with vendors to provide shuttle services between the two sites. *Id.* In or around early 2019, DAP sought to replace its existing shuttle vendor, Averitt Express ("Averitt"), a white-owned company. *Id.* Mr. David Schweon, DAP's Director of Logistics, selected Skyward as the new shuttle vendor, and on April 1, 2019, Skyward entered into a contract with DAP to provide shuttle services for an initial two-year term, with an opportunity for a one-year renewal. ECF Nos. 59-14, 64. Mr. Schweon signed the contract on behalf of DAP, and Mr. Lawrence signed on behalf of Skyward. ECF No. 59-14.

The relationship between DAP and Skyward soon deteriorated. On August 19, 2019, Roosevelt Bell, a Skyward truck driver, notified Zachary Jackson, a Black DAP supervisor, that Mr. Bell had seen a rope in a DAP truck in, what he perceived to be, the shape of a noose. ECF Nos. 59-2, 64. The parties' understandings of what happened next differ. DAP

---

[2] All references to the descriptor "Black" are from the Complaint. Skyward identifies Mr. Lawrence as "a Black male." ECF No. 1 at ¶ 50. Skyward self-identifies as a "Black-owned company solely owned by [Mr.] Lawrence." *Id.* at ¶ 50.

contends that it immediately began an investigation into the incident, which included reviewing hours of security footage and speaking to Mr. Bell and other witnesses, along with reaching out to Mr. Lawrence personally to check in on his well-being. ECF No. 59-2. Mr. Jackson was also disciplined for failing to immediately report the concern, in violation of DAP policy and his duties as a supervisor. *Id.* DAP ultimately was unable to determine who had placed the rope in the bed of the truck, as it was a vehicle that often drove off DAP property, and the open truck bed was easily accessible to anyone. ECF No. 59-2. Skyward contends that after the rope was reported, the DAP Plant manager, Rob Nagel, began manufacturing unfounded safety violations as a form of retaliation against Skyward. ECF No. 64. Further, Skyward asserts that Mr. Nagel was overheard saying that DAP needed to "get rid of this Black company." ECF No. 64.

Throughout Skyward's tenure, DAP became increasingly concerned with Skyward's performance and repeated safety issues. *See* ECF Nos. 59-2, 59-16, 59-17, 59-20. DAP asserts that on September 22, 2019, a Skyward driver exited a truck without engaging the break and allowed the truck to crash into a DAP building, causing $14,000 in damages. ECF No. 59-2. DAP also contends that "[o]n January 8, 2020, DAP discovered that Skyward's trailer had a large hole in the floor, and instead of repairing the hole, Skyward placed a large sheet of plywood [over the hole] to cover it." ECF Nos. 59-2, 59-16. Further, "[o]n January 20, 2020, while a DAP employee was loading a Skyward trailer, the legs on the trailer bent, which could have also resulted in serious injury to a DAP employee." ECF Nos. 59-2, 59-19, 59-20. Following the January 20 incident, Mr. Schweon sent the following email to Jeff Sayre, DAP's Distribution Center Manager:

3

I have a real issue with Skyward on this matter. I spoke to Curtis [Lawrence] who told me the only issue was the landing gear crank failed and their driver reported it and they removed the trailer. There was no mention of the landing gear leg being bent that caused this issue. Landing gears do sometime get stuck or strip but the legs themselves should never collapse.

I don't like being deceived when the attached statement is very clear[3]. Between that and the equipment failure itself *my inclination is to find a new shuttle company.* Let me know how you see the matter.

ECF No. 59-22 (emphasis added).

Though it is not clear from the record when it took place, DAP also had a meeting in January with Skyward to specifically discuss safety concerns. ECF Nos. 59-2. At the meeting, DAP requested information regarding "safety protocols and driver training." *Id.* Skyward appears to have not timely complied with DAP's request, and on January 31, 2020, Rafael Aleman, DAP's Safety Coordinator, sent Skyward the following email:

I am following up on my request for your training records and the report from your maintenance staff on the trailer whose landing gear failed. This is my third request for records of your training, please let me know if you have no records or do not conduct any training for your employees so I don't keep asking for non-existent files. I appreciate your help during the investigation of this incident sir.

ECF No. 59-23.

DAP asserts that safety issues continued into the spring of 2020. On April 8, 2020, a Skyward driver allegedly drove over a trailer jack, rending it inoperable. On April 15, a Skyward driver improperly positioned a truck to pull into a gate, such that the gate did not open. ECF Nos. 59-2, 59-24. The driver used the truck to force the gate open, which bent

---

[3] DAP has not provided the Court with the "attached statement." It is not clear from the record what it contained.

the gate and knocked it off its track. *Id.* On April 19, one of Skyward's trailers was caught on a ramp, which required DAP to cease using a dock until it could be repaired. ECF Nos. 59-2. On April 20, 2020, Mr. Schweon emailed Mr. Sayre to state that he wanted to "accelerate" the process of replacing Skyward. ECF Nos. 59-2, 59-28. Mr. Schweon began the process of issuing a Request for Proposals and interviewing other companies. ECF Nos. 59-2, 59-4 at ¶ 20.

In the meantime, safety issues persisted. On May 18, DAP discovered that a Skyward trailer had multiple holes in it, resulting in the trailer being removed from service. ECF Nos. 59-2, 59-26. On May 24, a Skyward driver ran over one of DAP's yellow trailer support poles, causing damage to the pole. ECF Nos. 59-2, 59-27.

Beyond DAP's safety concerns, an additional source of tension arose toward the end of the parties' contractual relationship. Skyward contends that it was asked to pick up pallets—a job that it argues was the responsibility of Pal-Serv, a separate, white-owned vendor. ECF No. 1.

On July 12, 2020, Mr. Schweon sent Skyward, via Mr. Lawrence, the following email, terminating the contract immediately:

> Please be advised that pursuant to paragraph 2.2 of the April 1, 2019 Master Transportation Agreement DAP Products Inc. ("DAP") is hereby providing Skyward Transportation, LLC with its immediate notice of termination of that agreement.
>
> Over the course of the many months, Skyward has committed numerous, serious transportation and vehicular safety violations at the DAP facilities causing property damage, as well as, unsafe conditions for DAP employees and equipment. Skyward had been notified of these safety performance and service commitment violations and has failed to cure the issues causing them.

5

After an evaluation of Skyward's performance, DAP cannot tolerate the unsafe situation any longer.

ECF No. 59-29.

Following receipt of this notification, Skyward promptly removed its property from DAP premises. *See* ECF Nos. 59, 64. Skyward does not contend that DAP failed to pay its invoices for work done under the contract in full. *Id.*

On March 16, 2022, Curtis Lawrence and Skyward filed the Complaint at issue, alleging unlawful interference with its contract because of race discrimination (Count I); unlawful termination of its contract because of race discrimination (Count II); retaliation (Count III); and common law breach of contract (Count IV). ECF No. 1. On June 23, 2022, this Court issued a Memorandum Opinion which, *inter alia*, granted DAP's Motion to Dismiss Mr. Lawrence as a Party Plaintiff. ECF No. 30. On May 31, 2023, DAP filed the present Motion for Summary Judgment, and Skyward filed its Response in Opposition on July 10, 2023. DAP filed its Reply on August 5, 2023. ECF No. 65.

## DISCUSSION

**Standard of Review**

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Anderson*, 477 U.S. at 248. There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). On the other hand, if after the Court has drawn all reasonable inferences in favor of the nonmoving party and "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

The party seeking summary judgment bears the initial burden of establishing either that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club,* Inc., 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).

**Analysis**

Race Discrimination in Violation of § 1981

"Section 1981 grants all persons within the jurisdiction of the United States 'the same right...to make and enforce contracts...as is enjoyed by white citizens.'" *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004) (quoting 42 U.S.C. § 1981(a)). To "make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To succeed in a § 1981 claim, plaintiffs "must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest," as well as membership in a protected class.

"A plaintiff can establish a discrimination or retaliation claim under Title VII or § 1981 in one of two ways. First, the plaintiff can establish the claim through direct or circumstantial evidence, or, alternatively, can establish the claim under the *McDonnell Douglas* burden-shifting framework." *Sanders v. Tikras Tech. Solutions Corp.*, 725 Fed.Appx. 228, 229 (4th Cir. 2018) (internal citations omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first offer a *prima facie* case of discrimination. *Sempowich*, 19 F.4th at 649. A plaintiff may do so by showing: (1) membership in a protected class; (2) satisfactory job performance; (3) that their employer took an adverse action against them; and (4) that they were treated differently from similarly situated

8

employees outside the protected class. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 626 n.8 (4th Cir. 2020); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Once the plaintiff makes this initial showing, "the burden shifts to the employer to put forth a nondiscriminatory explanation for its actions." *Sempowich*, 19 F.4th at 650 (*citing Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007)). If the defendant does so, "the burden then shifts back to the plaintiff to show that the employer's explanation was 'actually a pretext for discrimination.'" *Id.* (quoting *Lettieri*, 478 F.3d at 646).

Further, in order to be successful in a claim for race discrimination under § 1981, a plaintiff must "plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. National Assoc. of African American-Owned Media*, 140 S. Ct. 1009, 1119 (2020). "Under this 'but-for' standard, it is not enough to show that race played 'some role' in the defendant's decisionmaking process." *State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic*, No. CCB-18-1279, 2022 (WL 3106937, at *2 (D.Md. Aug. 4, 2022) (quoting *Comcast*, 140 S. Ct. at 1013, 1019).

<u>Unlawful Interference with and Termination of Skyward's Contract because of Race Discrimination (Counts I & II)</u>

DAP argues that it is entitled to summary judgment on Skyward's § 1981 claims of unlawful interference with and termination of its contract because of race discrimination. ECF No. 59. DAP does not contest that, as a Black-owned company, Skyward is a member of a protected class. *See* ECF No. 59-2. Nor does it contest that Skyward was subject to an adverse employment action. *Id.* DAP does, however, argue that Skyward cannot make the requisite showing on the second and fourth prongs of the *prima facie* case. *Id.* I agree.

Skyward has not successfully alleged that it was satisfactorily performing its job or that it was treated differently from similarly situated employees outside its protected class.

To establish the satisfactory job performance element, a plaintiff must show that they were "performing [their] job duties at a level that met [their] employer's legitimate expectations at the time of the adverse employment action." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). "Generally, in evaluating whether a plaintiff has met the legitimate expectations of her employer, '[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" *Rodgers v. Eagle Alliance*, 586 F.Supp.3d 398, 438 (D.Md. 2022) (quoting *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003)).

Here, the evidence overwhelmingly suggests that Skyward failed to meet DAP's expectations regarding safety. Skyward's tenure under the contract was plagued by repeated and well-documented safety issues, including an incident where a Skyward driver allowed a truck to roll into a DAP building after exiting the truck without engaging the break. ECF No. 59-2. There were further incidents involving equipment failure, such as a trailer with a hole in the floor, and a trailer whose legs bent while in use. ECF Nos. 59-2, 59-19, 59-20. DAP viewed the latter incident as so serious that it initiated a call with Skyward to discuss safety concerns and to request copies of Skyward's internal safety procedures. ECF Nos. 59-2, 59-23. Skyward was not forthcoming with the requested

information, evidenced by follow-up communications from Mr. Aleman, DAP's Safety Coordinator.[4] ECF No. 59-2.

Skyward counters by arguing that these safety concerns were manufactured by Mr. Nagel, who was acting out of racial animus and in retaliation for Skyward notifying DAP about the rope perceived to be in the shape of a noose. *See* ECF No. 64. However, the record contains scant evidence to suggest any racially motivated animus on Mr. Nagel's part. *See* ECF No. 64. Skyward also contends that, because DAP's previous shuttle vendor, Averitt, committed safety violations, but was not terminated for them, DAP was also meeting Skyward's expectations—despite its own poor safety record. Assuming *arguendo* that Averitt *did* in fact also commit safety violations, Skyward is not insulated from its own unsatisfactory performance. Skyward must still meet its employer's reasonable expectations, regardless of whether a previous company fell below them. In sum, Skyward's argument is insufficient to meet its burden of demonstrating that it was performing *all* or even *most* of its legitimate job expectations. *See Hill*, 354 F.3d at 285. There is no genuine dispute of material fact as to this element of Skyward's discrimination claims.

DAP next argues that Skyward cannot establish the fourth prong of a *prima facie* discrimination case—that similarly situated comparators outside of its protected class were treated more favorably. ECF No. 59-2. As noted above, Skyward contends that Averitt committed even more grievous safety violations but was never disciplined or terminated

---

[4] It is unclear from the record if Skyward maintained written safety protocols or driver training materials, and if they were ever shared with DAP following its request.

because of them. Skyward provides testimony from Jason Toombs, a former DAP employee:

> I was aware of many serious safety and performance problems with Averitt's services during my tenure with DAP. For example, while I was there, an Averitt driver: (i) pulled away from the dock with a forklift and a DAP employee attached to the back of the truck endangering the employee's life, (ii) pulled a safety lock from DAP's dock and damaged it, (iii) bumped DAP's gate at the distribution center multiple times, causing physical damage by knocking it off the track, and (iv) bumped the loading dock multiple times.

ECF No. 64, Aff. of Jason Toombs at ¶ 5.

However, Averitt is not an appropriate comparator. Averitt's alleged safety concerns are overall less severe, and appear to have been less frequent, than those credibly alleged against Skyward. *See* ECF Nos. 59-2, 59-16, 59-17, 59-20. It is clear from the record that DAP viewed Skyward's safety violations, such as letting an unattended truck hit a building, and using a collapsing landing gear leg, as posing particular risks to human safety. Given the difference in severity between Skyward and Averitt's alleged behavior, Averitt is not similarly situated in all relevant respects. *See Witherspoon v. Brennan*, 449 F.Supp.3d 491, 500–01 (D.Md. 2020) (Where a plaintiff's theory of discrimination is by comparison to employees from a non-protected class, the plaintiff must demonstrate that the comparator was similarly situated in all relevant respects. (internal quotations omitted)). There is no genuine dispute of material fact as to this element of Skyward's discrimination claims. Because Skyward has failed to show that it was satisfactorily performing its job and that others outside of the protected class were treated more favorably, Skyward has failed to make out a *prima facie* case of discrimination.

Legitimate Non-discriminatory Reason & Pretext

Even if Skyward could establish a *prima facie* case of discrimination, it has failed to rebut DAP's legitimate, non-discriminatory reason for terminating the contract— Skyward's unsatisfactory performance due to repeated safety violations. Skyward's performance deficiencies were well-documented throughout its contractual relationship with DAP. In support of its discrimination claims, Skyward identifies two incidents: the incident where one of its drivers found a rope in a DAP vehicle, notably *not* a Skyward vehicle, that it perceived to be a noose, and the incident when Mr. Nagel purportedly expresses a desire to "get rid of the Black company." *See* ECF No. 64. Neither of these incidents are sufficient to establish that DAP's non-discriminatory reason for terminating the contract was pretextual. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). (Pretext can be proven "by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of" racial discrimination (citation omitted)); *see also King*, 328 F.3d at 152.

The record provides scant support for the contention that the rope perceived to be a noose was placed in the bed of the DAP truck out of any targeted racial animus. *See* ECF Nos. 59, 64. Notably, the rope was found in the bed of a *DAP* truck, and not in or on *Skyward's* trailers or other property. *Id.* Further, the truck was often driven off property, and, as DAP's investigation of the matter concluded, the rope could have been placed in the truck bed by anyone. *Id.* As for Mr. Nagel's alleged comment about "getting rid of the Black company," insufficient context exists to infer racial animus. *See id.* Skyward self-identified as a Black-owned company. To the extent that Mr. Nagel may have acted in an

unprofessional manner, that behavior would still be insufficient to establish pretext. Mr. Nagel had no authority over Skyward's employment with DAP, and the record indicates that Mr. Schweon was the only DAP employee with the authority to hire or fire shuttle vendors. *See* ECF No. 59-4. Therefore, no nexus exists between Mr. Nagel's alleged comment and Skyward's termination. *See Ousley v. McDonald*, 648 Fed.Appx 346, 348–49 (4th Cir. 2016) (considering only the motivations of the formal decisionmaker even when the individual alleged to have a discriminatory motive "acted as a consultant" on the final employment decision). For the foregoing reasons, Skyward is unable to demonstrate that "but-for" the race of its owner, it would not have been terminated. *See Comcast*, 140 S. Ct. at 1019. DAP's Motion for Summary Judgment is GRANTED as to Counts I and II of the Complaint.

Retaliation for Protected Activity (Count III)

DAP next argues that Skyward is unable to establish that DAP terminated the contract in retaliation for engaging in protected activity in violation of § 1981. ECF No. 59-2. Skyward states that it complained to DAP about two separate issues: (1) the rope perceived to be a noose and (2) being asked to pick up pallets, which it considered to be the contractual responsibility of Pal-Serv, a white-owned vendor. ECF No. 1. Skyward argues that DAP terminated the contract based on Skyward's objection to the discriminatory treatment it faced. *Id.*

"It is well-settled that the elements that plaintiffs must satisfy to state a prima facie case of retaliation under § 1981 equal the elements of a prima facie case of retaliation under Title VII." *Jenkins v. Gaylord Ent'mt Co.*, 840 F.Supp.2d 873, 880 (D.Md. 2012).

14

Retaliation under § 1981 is analyzed under the same "*McDonnell Douglas* burden-shifting framework" as a discrimination claim. *Sanders*, 725 F. App'x at 229. To do so, a plaintiff must establish: "(1) that [they] engaged in protected activity; (2) that [their] employer took an adverse employment action against her; and (3) that a causal connection exist[s] between the protected activity and the adverse employment action." *Id.* (citing *Tasciyan v. Med. Numerics*, 820 F.Supp.2d 664, 675 (D.Md. 2011).

DAP concedes that Skyward arguably engaged in protected activity when it reported the rope and when it protested being required to transport pallets, and that Skyward was subject to an adverse employment action. ECF No. 59-2. However, it argues that no causal connection exists between the purportedly protected activities and the adverse employment action. I agree.

Regarding the rope incident, the rope was found on August 19, 2019, and DAP had knowledge that Skyward had complained about it by the following day. ECF Nos. 59-2, 64. However, DAP terminated its contract with Skyward on July 12, 2020, *nearly 11 months later*. Even drawing all reasonable inferences in Skyward's favor, the temporal proximity between the inciting rope incident and the termination of the contract is "too tenuous to support a reasonable inference of causation." *Ali v. BC Architects Engineers, PLC*, 832 F.App'x 167, 173 (4th Cir. 2020) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

Skyward also contends that its contract was terminated because it complained that it had to pick up pallets. Mr. Lawrence testified that he complained about having to complete the pallet work immediately prior to the contract's termination. *See* ECF No. 59-

5, pg. 24. While DAP concedes that the pallet complaint may have been protected activity, I find that DAP's request that Skyward pick up the pallets lacks any discriminatory animus. *See Sanders*, 725 F. App'x at 229 (holding that because no evidence connected any "untoward behavior or comments with any form of racial...discrimination," the plaintiff's subjective belief that her supervisor was acting with discriminatory intent was "not objectively reasonable.") Skyward could have refused to pick up the pallets if it found the request offensive, and Skyward was fully paid for the work it completed. *See* ECF No. 59-14.

Further, it is not clear from the record when Skyward made the pallet complaint, but the issue appears to have arisen in early July, immediately prior to Skyward's termination. ECF Nos. 59-2, 59-4. By that time, DAP had already long decided to take measures to replace Skyward. *See* ECF Nos. 59-2, 59-28. In an April 20, 2020 email from Mr. Schweon to Mr. Sayre, Mr. Schweon stated that he wanted to "accelerate the process" of replacing Skyward. ECF No. 59-28. Mr. Schweon then began to put together a Request for Proposals in search of a new shuttle vendor. *Id.* Because Mr. Schweon had already begun the process of finding a replacement, no nexus exists between the protected activity and the adverse employment activity. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007), cert. denied, 552 U.S. 1102 (2008) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)) ("To prove a causal connection, [the plaintiff] must be able to show that [the employer took an adverse action] "because the plaintiff engaged in a protected activity.").

Even if Skyward could establish a *prima facie* case of retaliation, its history of safety violations would again preclude it from being able to establish pretext under the burden shifting framework. Skyward has failed to sufficiently allege that a genuine dispute of material fact exists to support a claim of retaliation in violation of § 1981. DAP's Motion for Summary Judgment is GRANTED as to Count III of the Complaint.

<u>Breach of Contract (Count IV)</u>

DAP next argues that it is entitled to summary judgment on Skyward's breach of contract claim. In Count IV of its Complaint, Skyward contends that "DAP failed to provide written notice of any perceived breach(es), failed to allow Skyward the contractually–mandated period to cure any perceived breach, and failed to adequately provide notice of DAP's unlawful termination of the Contract on July 12, 2020." ECF No. 1 at ¶ 93.

The contract provides the following regarding termination:

2. Termination
2.1 Either party can provide (90) days written notice for any reason to cancel this Agreement without penalty.
2.2 Default and Cure/Termination. *Either party may terminate this Agreement immediately* in the event either party fails to perform any conditions of this Agreement, including but not exclusive of, service commitments, *safety performance*, payment of invoices, or any failure to perform, then,

(1) The party claiming default must make a demand in writing describing the performance failure with reasonable detail. If the notified party does not cure the claimed default or adequately rebut the claim of default within thirty (30) days of the notice, then the

> claiming party may terminate this Agreement at the end of the thirty
> (30) day period in accordance with Section 20[5] herein;
> *or,*
> (2) Carrier shall render to the Shipper invoices for the services
> performed under this Agreement, and Shipper shall make payment
> within thirty (30) days after date of each invoice.

ECF Nos. 59-2, 59-14 (emphasis added).

The contract also provides the following regarding notices between the parties:

> 17. Notices All notices which may be given in connection with this
> Agreement shall be in writing; shall be sent postpaid by the party desiring to
> give such notices to the other party by U.S. Certified Mail, addressed to such
> other party at its address shown at the end of this Agreement, and shall be
> deemed to have been given when so sent.

ECF No. 59-14 at ¶ 17.

Courts in Maryland "have long adhered to the objective theory of contract

interpretation, giving effect to the clear terms of agreements, regardless of the intent

of the parties at the time of contract formation." *Myers v. Kayhoe*, 391 Md. 188, 198

(2006). Under this theory:

> A court construing an agreement under [the objective theory] must first
> determine from the language of the agreement itself what a reasonable person
> in the position of the parties would have meant at the time it was effectuated.
> In addition, when the language of the contract is plain and unambiguous there
> is no room for construction, and a court must presume that the parties meant
> what they expressed. In these circumstances, the true test of what is meant is
> not what the parties to the contract intended it to mean, but what a reasonable
> person in the position of the parties would have thought it meant.

*Id.* (citing *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656–57
(2006).

---

[5] Section 20 states: "Governing Provisions: This Agreement shall be governed, construed,
and enforced in accordance with the laws of the State of Maryland applicable herein, except
to the extent of applicable federal law.

Resolving this dispute requires the Court to determine whether DAP had the
right to immediately terminate the contract upon safety concerns, or whether DAP
was required to give Skyward 30 days' notice and an opportunity to cure the issues.
Applying the objective theory of contract interpretation, I conclude that 2.2(2)
applies and imposes no requirement on DAP to provide 30 days notice. Given the
conjunction "or" between sections 2.2(1) and 2.2(2) of the termination provision, a
reasonable person reading the contract would assume that either avenue was
available for terminating the contract. *See Credible Behavioral Health, Inc. v.
Johnson*, 466 Md. 380, 397 (2019) ("As a bedrock principle of contract
interpretation, Maryland courts consistently strive to interpret contracts in
accordance with common sense." (internal quotations omitted)). This interpretation
is bolstered by the language preceding sections 2.2(1) and 2.2(2): "*Either party* may
terminate this Agreement immediately in the event *either party* fails to perform any
conditions of this Agreement...." ECF No. 59-14 at ¶ 2. The repeated use of the
phrase "either party" preceding sections 2.2(1) and 2.2(2) is clearly meant to convey
that either party has the option of electing to terminate the contract through the
provisions in 2.2(1) *or* in 2.2(2). *See id.* DAP had the right to terminate the contract
with Skyward immediately for safety violations, as long as it paid Skyward's
invoices within 30 days. Neither party contends that DAP failed to pay Skyward's
invoices. *See* ECF No. 59-2.

Skyward next contends that, even if DAP did have the right to terminate the
contract via the in 2.2(2) provision, a triable issue of fact still exists as to whether

19

DAP provided Skyward with proper notice of the termination. Skyward argues that "DAP's assertion that it properly terminated the Contract is legally untenable due to DAP's undeniable failure to comply with Paragraph 17 of the Contract and undeniable failure to use U.S. Certified Mail" in providing notice of the termination. ECF No. 64. I do not agree.

Under Maryland law, "[w]aiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 531 (1964). Critically, "there must be evidence of such conduct on the part of the party possessing the right to show a relinquishment of that right." *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 361 (1974); *see, e.g., Lissau v. Smith,* 215 Md. 588, 138 (1958) (vendor's communicated intention, before time of performance, not to insist on timely or exact performance constituted waiver of the provisions in the contract as to time). Arguably, by signifying that it accepted the termination by vacating DAP property immediately after receiving text and email notification, without insisting on notification by certified mail, Skyward waived its right under the contract to receive notice by certified mail.

However, even if Skyward's actions did not constitute a waiver, numerous jurisdictions have held that email notification can be sufficient, even when the contract specifically calls for notification by certified mail or other means. *See, e.g., Thurston v. Sisca*, No. 1:14-CV-1150 (GTS/DEP), 2016 WL 4523930, at *6 (Aug.

20

22, 2016 N.D.N.Y); *Giacone v. Virtual Officeware*, LLC, 642 Fed.Appx 137 (3d Cir. 2016). In *Thurston,* the defendant opposed summary judgment in a contract dispute, arguing that plaintiff's notice violated the contract because it was sent by email and not by certified mail or by courier with receipt acknowledged. *Id.* The court held instead that:

> *Here, the email does not appear to have undermined any of the objectives of the notice-requirement provision...*Defendant's counsel successfully and promptly received the email (given that he responded to it one day after it was sent); he did not overlook the relevant portion of the email (given that he responded to its attempt to terminate the Purchase Contract); he did not resist the ultimate relief requested in the email (i.e., the termination of the Purchase Contract); and documentation of receipt of the email was generated (given the attachment of the email to a subsequent email from Defendants' counsel). Furthermore, Defendants' counsel himself appeared to use email as a means of communicating notice of termination of the Purchase Contract. *Under the circumstances, email appears to have been an efficient (and accepted) alternative to the other methods of notice.*

*Id.* (cleaned up and emphasis added).

At issue in *Giacone* was the manner in which a termination notice, pursuant to an employment agreement, was received. The employment agreement provided that notice be "(i) in writing, (ii) delivered personally, by courier service or by certified mail, first-class postage prepaid and return receipt requested, and (iii) deemed to have been received on the date of delivery or, if so mailed, on the third business day after the mailing thereof." *Id.* The defendants argued that the actual notice given, which was by email and regular mail, did not comport with these requirements. *Id.*

21

The Third Circuit disagreed, holding that "[w]e refuse to vacate merely because the letter (which was clearly received by the Defendants) was sent by e-mail and regular mail[.]" Further, "'[w]hen a party has honestly and faithfully performed all material elements of its obligation under a contract, but has failed to fulfill certain technical obligations, causing no serious detriment to the injured party, it would be odious and inequitable to compel forfeiture of the entire contract.'" *Giacone*, 642 Fed.Appx at 142 (quoting *Barraclough v. Atl. Refining Co.*, 230 Pa.Super. 276, 326 (1974).

DAP's termination notice to Skyward sufficiently fulfilled its obligation. The record demonstrates that DAP notified Skyward that the contract was terminated on July 12, 2020, via email[6]. ECF Nos. 59-4, 59-29. The email notice "does not appear to have undermined any of the objectives of the notice-requirement provision" in ¶ 17 of the contract. *See Thurston*, 2016 WL 4523930, at *6. Skyward clearly promptly received the notification, given that Skyward shortly removed its property from the Plant and the Distribution Center. Further, it does not appear that Skyward suffered any serious detriment by being notified in this fashion—Skyward has not pled any alleged injuries. Under these circumstances, requiring strict compliance with the notification provision would be inequitable. Skyward has failed to sufficiently allege that a genuine dispute of material fact exists as to whether DAP

---

[6] DAP also contends that the notice was sent by text but has not included the text purportedly sent in the record.

breached the contract. DAP's Motion for Summary Judgment is GRANTED as to

Count IV of the Complaint.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, Defendant's Motion for Summary

Judgment (ECF No. 59) is GRANTED as to all Counts. A separate Order will follow.

Date: 6 November 2023

A. David Copperthite
United States Magistrate Judge

23